IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHELLE SANTOS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:16-CV-440-RP |
| | § | |
| WINCOR NIXDORF, INC., | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court are Defendant's Motion for Summary Judgment, (Dkt. 43), the responsive pleadings, and Wincor's Objections to and Opposed Motion to Strike Portions of the Declaration Submitted in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, (Dkt. 48). Having reviewed the filings, the relevant law, and the factual record, the Court issues the following order.

## I. BACKGROUND

*A. Santos's Employment and Termination*

The claims in this case arise out of Defendant Wincor Nixdorf, Inc.'s ("Wincor") termination of Plaintiff Michelle Santos's ("Santos") employment. Santos began working for Wincor in October 2014 in Austin, Texas as a Project Analyst. (Santos Dec., Dkt. 45-1, at 1). Staffmark—a staffing agency—placed Santos in the position and administered her payroll, but Wincor directed and supervised Santos's work. (*Id.*). Santos's supervisor at Wincor was Danielle Mathews ("Mathews"). (*Id.*). Mathews testified in her deposition that she "always" intends for Staffmark's placements to become permanent employees of Wincor. (Mathews Depo., Dkt. 45-3, at 64–65). Santos never made it that far.

1

About a month into her job, in November 2014, Santos notified Mathews that she was pregnant. (Dkt. 45-1, at 2). For the next few months, Santos's work continued in much the same way as it had since she began working there in October. (*Id.*). Santos was as an hourly, non-exempt employee earning $25 per hour. (Def. Mot. Summ. J., Dkt. 43, at 3; Pay stubs, Dkt. 43-3). She worked in the finance department of Wincor's Logistics Facility and received overtime pay if she recorded more than 45 hours of work in one week. (Def. Mot. Summ. J., Dkt. 43, at 3; Pay stubs, Dkt. 43-3). Staffmark placements, like Santos, were trained on the job for about six months, rather than completing a formal training program. (Dkt. 45-1, at 1; Dkt. 45-3, at 79-80).

Towards the end of January 2015, Santos's physician instructed her to work from home because of several serious pregnancy-related conditions that developed during her high-risk pregnancy. (Dkt. 45-1, at 1). Santos sent Mathews an email explaining her situation:

> Hi Danielle,
>
> Hope you had a good weekend.
>
> This email is concerning my recent stay at the hospital. Please note that unfortunately I'm having complications with my pregnancy and need your support and understanding with the following please.
>
> I know you've expressed to me several times that you do not mind me working from home which is great because right now I really need to accept your offer.
>
> Due to complications I'm having with my high[-risk] pregnancy I need to work from home. After conversation with Dr regarding my condition and regarding work, please note that I'm still able to work and fully perform all my duties however with a few accommodations at home.
>
> Please confirm if this is a reasonable accommodation with you.
>
> I know my high risk pregnancy has been a bit challenging for me but thank God I'm finally at my 3rd trimester an God willing I will have my baby in my arms soon. As we discussed recently on my 1 on 1, Dr will be inducing me on the 13th of March and as we've previously discussed and agreed, I'm only planning on taking that first week off to heal (03/16 thru 03/20) after that, I will work a couple of weeks

2

from home (that way I can breast feed and bond with baby's first days of life) and then things shall resume to normal.

Upon review, please kindly provide feedback.

Awaiting your reply…

Thank you,

Michelle C. Santos

(January 2015 emails, Dkt. 45-5, at 5–6).

Mathews responded:

> Hello Michelle
>
> Please send me the Dr's note regarding the below. Working at home on a short term basis on the days you aren't feeling well is different from what you are proposing. I do commiserate with your situation and hope we can make this work.
>
> After recent conversations here, I'm a little concerned with your motivation. I'm also concerned with how we can make some recent adjustments work while you are not in the office, i.e. emails. Please provide your thoughts on how we can work on this situation.
>
> Thanks
>
> Danielle

(*Id.* at 5).

Santos replied to Mathews with the note from the doctor and expressed that she was "very motivated" and proposed sending draft emails to Mathews for her approval. (*Id.*). Mathews forwarded the email thread with Santos to Chad Lyon ("Lyon"), who was her contact at Staffmark. (*Id.* at 1). In her email to Lyon, Mathews said:

> Hi Chad
>
> I wanted to keep you in the loop on the below.
>
> I haven't come up with a plan, yet, or decided what I want to do. We had been having a few problems, and though overall Michelle is a smart woman, I don't like the idea of a contractor still in training working from home for more than 7 weeks.

> Thanks
>
> Danielle

(*Id.* at 1). Santos then began working from home. (Dkt. 45-1, at 2).

Wincor points to what it identifies as performance issues that cropped up while Santos was working from home. Mathews testified in her deposition that Santos's work "wasn't great," (Dkt. 43-2, at 97), and that she warned Santos that her job assignment was in jeopardy because of her performance during one-on-one meetings and phone calls, (*id.* at 100). Santos disagrees with that account, saying that "at no time . . . did Mathews express to me that she was dissatisfied with my overall job performance, or that my job was in jeopardy. I was never given . . . a write-up or verbal warning. She never told me that if I didn't improve or perform in a certain way, that she would terminate me." (Dkt. 45-1, at 2). Wincor also presents emails between coworkers. In mid-January, emails indicate that Santos was not aware of responsibility for an account. (Dkt. 43-8, at 2–3). On January 20, there was a delay on resolving an issue on an order. (Dkt. 43-9, at 2). Towards the end of January, emails suggest that Santos was not aware of an invoicing responsibility. (Dkt. 43-10, at 2). Finally, on January 29, one of Santos's coworkers emailed her the following:

> You cant be on do not disturb. How are we going to get your attention.
> We cant walk over to you.
> Here is what I was texting you for hours.
> How about my sales tax questions.
> What is going on, Why are you at home.

(Dkt. 43-7, at 3). Within a few minutes, Santos responded:

> Please send me an email Joe, it's end of month billing (last day for billing) and I have 8 IM's going on with requests (see screenshot below). I have urgent tickets to send to RAC and we are closing our billing today.
> **It's the first time (since I've been working from home) that I put myself on DND and it's only for about an hour so I [can] get things done.**
> I will respond to your emails and/or requests ASAP.
> Thank you for your patience and understanding.

4

(*Id.* at 2) (emphasis in original). Santos then forwarded the email thread to Mathews with the following note:

> Danielle,
> Just an FYI…
> I had to put myself on DND for about an hour or so I can get tickets out to RAC.
> Please let me know if ok?
> Thanks,
> Michelle

(*Id.*). On the same day, Mathews asked Lyon to begin searching for a replacement for Santos: "I'm not ready to let her go but do not think she will work out long-term." (Dkt. 43-11, at 2).

About a month later, on February 23, Mathews noticed Santos had recorded hours during a time the system was offline the week before and contacted Santos asking if her hours recorded that last week were correct. (Dkt. 43-12, at 5). Santos responded they were correct, adding that she had removed "a few hours otherwise I would be way over and I hadn't asked for prior authorization for those." (*Id.* at 4). Mathews replied that Santos should be entering "exactly the hours you work." (*Id.*). Mathews also explained: "I asked the question because the system was down [that day] until about 1:30pm but I see you have counted hours from 8:50am." (*Id.*). A few hours later, Santos sent Mathews a long email expressing that it was difficult to complete the work in 40 or even 45 hours, which Santos said was a problem for coworkers too, and that she was working those extra hours because she was "afraid and concerned that you'll think I'm not completing my duties for the wrong reasons. The last think I want you to think is that I'm not being able to cope with my work . . . ." (*Id.* at 2–3). She also explained that she spent the morning the system was down trying to log in, which she was able to do just before 1:00 p.m., and drafting emails to go out once the system was back up. (*Id.* at 3). The next day, Mathews reiterated to Lyon that he needed to replace Santos: "Please begin sourcing to replace Michelle if you haven't already. I'll be looking to start someone new by mid to late March." (Dkt. 43-13, at 2).

5

On March 10, 2015, a few days before Santos was scheduled to give birth, Staffmark—at Wincor's direction—terminated her employment assignment at Wincor. (Dkt. 45-1, at 3). Lyon testified that he informed Santos she was being terminated "due to performance." (Lyon Dep., Dkt. 43-14, at 35–36).

*B. Procedural History*

On April 6, 2016, Santos sued Wincor and Mathews alleging (1) a violation of the Fair Labor Standards Act ("FLSA"), (2) retaliation under the FLSA, and (3) under Title VII, discrimination based on sex. (Compl., Dkt. 1, at 4–6). After Wincor filed an answer, (Dkt. 5), Wincor moved to compel arbitration, (Dkt. 8). After reviewing the parties' submissions and holding a hearing, this Court denied Wincor's motion. (Dkt. 13). Then Wincor filed a motion to join Staffmark as a codefendant, (Dkt. 21), which this Court denied, (Dkt. 34). Santos dropped Mathews as an individual defendant from the case. (Stipulation of Dismissal, Dkt. 32; Order Adopting Stipulation of Dismissal, Dkt. 33). Santos filed an amended complaint on December 21, 2017, against Wincor. (Dkt. 41). The amended complaint omitted the violation of the FLSA but asserted the FLSA retaliation claim and pregnancy discrimination claim. (*Id.*). Finally, after Wincor filed its motion for summary judgment and Santos filed her response, Wincor filed a motion to strike portions of the Santos declaration. (Dkt. 48).

**II. STANDARD OF REVIEW**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view this evidence in the light most favorable to the non-movant, *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993), and should "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### III. DISCUSSION

*A.    FLSA Retaliation*

In her amended complaint, Santos alleged that, in the February 23, 2015, email, she "described her struggle with the fact that she either had to work unpaid hours over 45 to get the work done, or suffer the job consequences of work not getting done." (Dkt. 41, at 3). Further, Santos described the problem as "'issues with overtime hours.'" (*Id.* (quoting from the Feb. 23, 2015, email)). Santos further alleged that the next day Mathews instructed Lyon at Staffmark to begin searching for a replacement. (Dkt. 41, at 3).

7

In its motion for summary judgment, Wincor argues that Santos's FLSA retaliation claim fails as a matter of law. To establish a prima facie case for retaliation under the FLSA, a plaintiff must show (1) participation in protected activity under the FLSA; (2) adverse employment action; and (3) a causal link between the activity and the adverse action. *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008). Wincor focuses its argument on the first prong—whether Santos participated in a protected activity under the FLSA. Pursuant to 29 U.S.C. § 215, it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Because Santos did not institute a proceeding, Santos's claim turns on whether she filed a complaint, which, if she did, would have constituted a protected activity under Section 215(a)(3). *Hagan*, 529 F.3d at 623, 626 (holding that a complaint under Section 215(a)(3) can be an informal, internal complaint). An informal complaint, however, must still "concern some violation of law." *Id.*

The question therefore before this Court is whether Santos's February 23 email about overtime hours amounted to an informal complaint about a violation of law. For an employee's communication to constitute a complaint, the "employer must have fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation" and the "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Although the complaint can be informal, "not all abstract grumblings or vague expressions of discontent are actionable as complaints." *Hagan*, 529 F.3d at 626. While a plaintiff need not explicitly refer to the

8

FLSA statute itself, the complaint does need to be framed in terms of potential illegality. *See id.* at 626.

In her February 23 email, Santos makes the following statements about the number of hours she worked:

> (1) "Truth is the work load is very high and it's not equivalent for completion in a 40 hour week time frame, not even in 45 hours to be completely honest."
> (2) "In lieu of the fact that I'm working from home I have been putting extra hours and yes, very often working more than 45 hours to complete my work."
> (3) "Matters come down between me putting extra hours to get the work done or not going over the hours and leave working not completed, as you can see it's a tough decision."
> (4) "I have opted to putting in the extra hours but showing that I care my job, my work and my customers/team."
> (5) "Also it seems that I'm not the only one who has had issues with overtime hours. Anna, Vanessa and Amanda claimed they also at the time had issues with their overtime ours when they started with Wincor."
> (6) "Apparently the work load was too high to have it completed within the allowed overtime hours."
> (7) "Hardest part is that you as my supervisor might feel that perhaps I'm not giving same excellence or effort in my work, or perhaps that I'm not understanding my work and not reaching out for help, or perhaps that I'm not being fast enough however truth is that the work load is high and again often 45 hours is not enough to get it all done."
> (8) "Also, not sure if you recall one of the first weeks that I was working from home I reached out to you concerning my hours and informed you I had reached 45 hours and asked you for approval for additional hours to complete my work, you didn't question me on what I had pending left to do and you just told me to log off for the day. Anyhow, the following week I recall being questioned about some things that were not completed. Again, unfortunately, this is a tough spot to be in because I either work past 45 hours and get the work and have peace of mind that my work got done or I work 45 hours and don't get work done then can have potentially serious problems with work not getting done."
> (9) "You can check with IT for yourself and see how many hours I've put in and in addition I can show you emails, tickets, work that I have completed past 5pm, sometimes it's 11pm or midnight and I'm still working."

9

> (10) "I know I'm next in line to be hired (seniority temp) perhaps and God willing once I become permanent this would end the issue with overtime hours."

(Dkt. 45-7, at 4–5).

Santos thoroughly described her work situation as one in which she was making one of three choices with regularity: (1) work 45 hours and not complete work, (2) work more than 45 hours but not record the overtime hours, and (3) ask her supervisor to approve overtime hours and work more than 45 hours to complete work. Santos explained that she did not find the third option desirable for several reasons. Thus, she tended to either work within the hour parameters set by Wincor or work more but not disclose those hours to her supervisor or record them. She expressed her frustration to Mathews with what she saw as effectively her two options and her more general frustration with the overall workload. What she does not express is a complaint that she is not being paid for her extra hours. *Cf. Vallejo v. N. E. Indep. Sch. Dist.*, No. SA-12-CA-270-XR, 2013 WL 3050484, at *7 (W.D. Tex. June 17, 2013) ("Although Vallejo did not phrase his complaint in terms of a potential FLSA violation, from the record it is evident that Vallejo was clear in his communication that he was concerned with the nonpayment of his alleged overtime and that he believed Mr. Jackson was altering Vallejo's timecard inappropriately. By confronting Mr. Jackson on numerous occasions and speaking to payroll management, Vallejo adequately put NEISD on notice that he was concerned with his rights to receive compensation for the time that he had actually worked."). In her email, Santos seemed concerned about how her failure to complete work might reflect on her motivation as an employee, but she does not seem concerned about the failure of Wincor to compensate her for those extra hours.[1] *See, e.g., Alvarez v. Amb-Trans Inc.*, No. SA-11-CV-179-XR, 2012 WL 4103876, at *3 (W.D. Tex. Sept. 17, 2012) ("Specifically, Alvarez alleges that he told his manger that he was not getting paid the full amount of overtime that he was supposed to

---

[1] Santos does refer to compensation with respect to the hours she worked while the system was down, but those hours were not overtime hours.

receive . . . . Since Alvarez's statement was to a supervisor in the company and regarded improper payment, his statement would constitute protected activity under the FLSA. . . . Crist says he complained that he was not receiving pay for days that he came into work on scheduled days off. Again, since Crist's statements were to a supervisor and concerned improper payments, his complaints would constitute protected activity.") (citations omitted). Because her complaint does not concern a violation of law, Santos has not alleged a protected activity. Thus, her FLSA retaliation claim cannot survive summary judgment.

   B. *Title VII Pregnancy Discrimination*

The Pregnancy Discrimination Act states that Title VII's prohibition against sex discrimination applied to discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "A claim brought under the PDA is analyzed like any other Title VII discrimination claim." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). An employer is liable for disparate treatment, which occurs when the employee's "protected trait actually motivated" the employer to take the adverse employment action. *Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1345 (2015) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)). A "plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973) ]." *Id.*

   1. Direct Evidence of Discrimination

Wincor contends that Santos fails to raise direct evidence of discriminatory evidence. Santos disagrees. Citing Mathews's email to Lyons on January 27, 2015, Santos asserts that "Mathews only decided to consider terminating Santos when she received the notice about the complications with Santos's pregnancy and her need for an accommodation" and that "a reasonable juror could

11

perceive that Mathews is in fact complaining about the burden of Santos's accommodations and pregnancy, and considering terminating Santos's assignment as a result." (Dkt. 45, at 7–8). In her January 27 email, Mathews forwards Santos's email regarding her doctor's instructions to work from home because of pregnancy complications and adds: "I haven't come up with a plan, yet, or decided what I want to do. We had been having a few problems, and though overall Michelle is a smart woman, I don't like the idea of a contractor still in training working from home for more than 7 weeks." (Dkt. 45-5, at 1). Santos, in her declaration, also stated that after a few weeks of working from home, Mathews asked her over the phone to start coming into the office three or four times each week, which Santos declined to do because of her doctor's instructions. (Dkt. 45-1, at 2).

"Direct evidence is evidence which, if believed, proves [disparate treatment] without inference or presumption." *Fairchild*, 815 F.3d at 966 (brackets in original) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)). Courts consider whether the comments show, "without inference or presumption, that [pregnancy] was a basis in employment decisions" in the plaintiff's workplace. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015) (quoting *Jones*, 427 F.3d at 993). Direct evidence includes "any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).

Santos's proffered direct evidence is lacking. In her email to Lyons, Mathews stated that she did not "like the idea of a contractor still in training working from home for more than 7 weeks." (Dkt. 45-5, at 1). In a phone call with Santos, Mathews asked Santos to come in to the office, while Santos was working from home because of pregnancy complications, three or four times each week. (Dkt. 45-1, at 2). Viewing this evidence in a favorable light to Santos, the evidence still requires a juror to make an inference. Santos seems to concede that in her response to the motion for

12

summary judgment when arguing that the email is direct evidence: "A reasonable juror could perceive that Mathews is in fact complaining about the burden of Santos's accommodations and pregnancy." Santos is correct. A juror cannot take the statement on its face as demonstrating that Mathews sought to terminate Santos because of Santos's pregnancy or pregnancy-related accommodations. *Fabela*, 329 F.3d at 415. Rather, a juror would need to infer that Mathews saying she did not like the idea of a trainee working from home for a lengthy period really meant that Mathews planned to terminate Santos's employment because of, or in part because of, Santos's pregnancy. That type of inference is impermissible in the context of direct evidence. *Fairchild*, 815 F.3d at 966. Santos therefore failed to present direct evidence of pregnancy discrimination.

2. Circumstantial Evidence of Discrimination

Santos can show pregnancy discrimination without direct evidence by using the burden-shifting framework set forth in *McDonnell Douglas*, 411 U.S. 792. Under the *McDonnell Douglas* analysis, a plaintiff is entitled to a "presumption of discrimination" if she can meet the "minimal initial burden" of establishing a prima facie case that the defendant made an employment decision that was motivated by a protected factor." *Fabela*, 329 F.3d at 415. Upon a showing of a prima facie case, an inference of discrimination is established, and "'the burden shifts to the employer to show a legitimate, nonretaliatory reason'" for the adverse employment action. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (quoting *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011)). If the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing that the employer's proffered reason is pretextual. *Reed*, 701 F.3d at 439; *Black*, 646 F.3d at 259.

To establish a prima facie case of sex or pregnancy discrimination based on circumstantial evidence, Santos must show evidence that: (1) she was a member of a protected group; (2) she was qualified for the position that she held; (3) she suffered an adverse employment action; and (4) she

13

was treated less favorably than similarly situated employees outside of her protected group. *McDonnell Douglas*, 411 U.S. at 802–03. Santos may establish a prima facie case of discrimination by showing that other employees outside of her protected class "who engaged in similar acts," known as similarly situated comparators, were treated more favorably. *Mayberry v. Vaught Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (explaining that a plaintiff must show that similarly situated employees "were treated differently under circumstances 'nearly identical' to his"). Wincor does not contest that Santos has presented sufficient evidence showing she was a member of a protected group, was qualified for her position, and suffered an adverse employment action and argues, instead, that Santos has no evidence of any comparator treated more favorably.

Wincor contends that Santos cannot establish a prima facie case of pregnancy discrimination because: (1) Santos has no evidence that any comparable employee who was on temporary assignment from Staffmark was treated more favorably and (2) Santos has no evidence that any comparable employee was allowed to work from home, but was not pregnant, and was treated more favorably. Wincor goes further saying that Santos was treated more favorably than comparable new and temporary hires by being allowed to work from home.

In a footnote, Santos argues that the comparator described by Wincor—a person on temporary assignment from Staffmark—is incorrect. Santos states that the assignment was not temporary; rather, the assignment was part of the permanent hiring process that Wincor used for those positions. Santos then claims that Santos's comparators were all of Santos's coworkers who were treated more favorably because they were not terminated, save for one employee who was terminated within two weeks because he was unable to operate a basic software program. Santos also disagrees with the second comparator proposed by Wincor—a person who worked from home, but was not pregnant—pointing out that Santos performed her work duties on a full-time basis but with the accommodation of working from home during the remainder of her pregnancy. Instead,

14

according to Santos, the comparators should be her fellow full-time coworkers who did not require a work-from-home accommodation.

Courts consider a number of factors in determining whether employees are similarly situated.

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009). The similarly situated analysis is intended to ensure that the challenged action was "taken under nearly identical circumstances" like when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* at 260.

In this case, Santos presents no evidence about her comparators. Rather, the court is presented with attorney argument, in a footnote, about who should be considered similarly situated. Even if the Court were to agree with Santos on who might be identified as potentially similarly situated to her, Santos has not provided the Court with any names, titles, or other information that would allow the Court to make a determination. So while she may be correct that all of the other new employees who were in training for a permanent position and working full-time might have been comparators, she fails to identify a single person.[2] *See Williams v. City of Austin*, 170 F. Supp. 3d 939, 949 (W.D. Tex. 2016), *aff'd*, 683 F. App'x 280 (5th Cir. 2017), *reh'g denied* (Apr. 28, 2017) ("While the City's decision to indefinitely suspend Williams and bypass him for three promotions do

---

[2] The only person Santos mentions is an employee who was fired within two weeks because he was unable to operate basic software. Without more information, the Court cannot know whether that person had the same responsibilities, same supervisor, and worked full-time. The Court also cannot know whether his inability to operate software is similar or different to Santos's work history. Finally, this other employee was treated the same—he was terminated—or possibly less favorably than Santos since he was fired after just a few weeks on the job.

constitute adverse employment actions, Williams has still failed to meet his prima facie burden because he has presented no evidence of similarly situated individuals outside his protected class who were treated favorably under "nearly identical circumstances.") (citing *Lee*, 574 F.3d at 260). Therefore, having failed to identify similarly-situated employees, Santos has failed to establish a prima facie case of pregnancy discrimination.

## IV. EVIDENTIARY OBJECTIONS

Both parties advance objections to the other side's evidence. Santos raises three objections: (1) alleged statements by Ed McGrath, that Mathews recalled in her deposition, are hearsay; (2) Wincor's Exhibit G—the end of January 2015 email thread regarding Santos not responding to an instant message from a coworker—is hearsay; and (3) Wincor's Exhibit H—the mid-January email thread relating, in part, to whether Santos was aware that she was responsible for an account—is hearsay. Wincor responds that McGrath's statements were not introduced for the truth of the matter asserted and that the email threads are admissible because Santos does not refute the veracity of the statements and that the email threads are admissions of a party opponent. The Court does not rely on McGrath's alleged statements or the two January email threads in reaching its determinations on Santos's FLSA retaliation claim or Santos's pregnancy discrimination claim. Therefore, the Court need not reach the question of the admissibility of that evidence.

Wincor, in a separate motion, moves to strike portions of Santos's declaration. (Def.'s Obj. & Mot. to Strike, Dkt. 48). Objecting to twelve sentences of the declaration, Wincor argues that they are "unsupported, unsubstantiated, conclusory statements . . . that are insufficient to defeat . . . summary judgment," (Dkt. 48, at 2), and that a "declaration used to . . . oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Dkt. 48, at 2) (quoting Fed. R. Civ. P.

56(c)(4)). Because the Court has ruled in favor of Wincor on its motion for summary judgment, Wincor's arguments are moot.

## V. CONCLUSION

For these reasons, **IT IS ORDERED** that Wincor's Motion for Summary Judgment, (Dkt. 43), is **GRANTED** and Wincor's Objections to and Opposed Motion to Strike Portions of the Declaration Submitted in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, (Dkt. 48), is **DENIED**.

**SIGNED** on March 23, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE